UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| MICHELLE JAMES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.: 8:15-cv-2424-T-23JSS |
| v. | ) | |
| | ) | |
| JPMORGAN CHASE BANK, N.A., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL
OF CLASS ACTION SETTLEMENT**

**Introduction**

With the substantial assistance of Court-appointed mediator Robert M. Daisley, Esq., Michelle James and Nichole Seniuk (collectively, "Plaintiffs") reached an agreement with JPMorgan Chase Bank, N.A. ("Chase") to resolve their class action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. The TCPA makes it unlawful to use an automatic telephone dialing system ("ATDS") to make a call to a cellular telephone number without the prior express consent of the called party. At issue in this case are autodialed calls made by Chase intended for its own customers, regarding Chase deposit accounts, but that reached parties different from who Chase was trying to call. That is, Plaintiffs allege that Chase violated the TCPA by placing autodialed calls to cellular telephone numbers that were reassigned from Chase customers to new cell phone subscribers or customary users, including Ms. James and Ms. Seniuk, and as a result Chase did not have the call recipients' prior express consent to make such calls. Chase denies any liability or that its practices violate the TCPA.

1

Ms. James and Ms. Seniuk now seek preliminary approval of the parties' class action settlement agreement ("Agreement").[1] As explained herein, Ms. James, Ms. Seniuk, and their counsel firmly believe the settlement—which calls for the creation of a $3.75 million, non-reversionary common fund from which participating class members will receive a pro-rata portion after deducting attorneys' fees, expenses, and claims administration costs—is fair, reasonable, and adequate, and in the best interests of the class, particularly in light of the substantial risks and uncertainties of protracted litigation. Accordingly, Plaintiffs respectfully request that this Court enter the accompanying order granting preliminary approval of the settlement.

Chase does not oppose this relief.

### Summary of the Settlement

**A.      Plaintiffs allege that Chase violated the TCPA by placing autodialed telephone calls to reassigned telephone numbers associated with a deposit account. Chase denies Plaintiffs' allegations, and denies that it violated the TCPA.**

Congress enacted the TCPA in 1991 to address privacy and harassment concerns arising from certain telemarketing practices that escaped state invasion of privacy and nuisance statutes by operating interstate. *Mims v. Arrow Fin. Servs. LLC*, 132 S. Ct. 740, 745 (2012).[2] Noteworthy, unlike many federal statutes, Congress embedded the reasons for the TCPA into the statute itself with explicit "Congressional Findings." 105 Stat. 2394 (note following 47 U.S.C. § 227). In accord with these explicit findings, courts consistently hold that the TCPA is designed to protect consumers' privacy interests. *Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Penn.*, 442 F.3d 1239, 1249 (10th Cir. 2006) ("Courts have consistently held the TCPA protects a species of privacy

---

[1]      The Agreement and its exhibits are appended to the Declaration of Michael L. Greenwald, attached as Exhibit A.

[2]      Emphasis is added, and internal quotations and citations are omitted, unless otherwise noted.

interests in the sense of seclusion. [I]t is clear that Congress viewed violations of the Act as 'private nuisances' and 'invasions of privacy' under ordinary, lay meanings of these phrases.").

Congress accordingly concluded:

> Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

105 Stat. 2394 at § 14.

Against this backdrop, "[t]here are two elements to an auto-dialer TCPA claim that a plaintiff must allege: (1) a call to a cellular telephone; (2) via an automatic telephone dialing system." *Murphy v. DCI Biologicals Orlando, LLC*, No. 6:12-CV-1459-ORL, 2013 WL 6865772, at *4 (M.D. Fla. Dec. 31, 2013) *aff'd*, 797 F.3d 1302 (11th Cir. 2015). "Prior express consent" of the called party is an affirmative defense to a TCPA action. *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012) *aff'd*, 755 F.3d 1265 (11th Cir. 2014). Such prior express consent is "consent that is clearly and unmistakably stated." *See, e.g.*, *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (quoting Black's Law Dictionary 323 (8th ed. 2004)).

Here, Plaintiffs' claims are relatively straightforward: Chase made autodialed telephone calls to the cellular telephones of Ms. James and Ms. Seniuk, neither of whom had a business relationship with Chase. Chase made these calls while attempting to reach its own customers. However, the customers Chase attempted to reach allegedly changed their phone numbers at some point after providing their phone numbers to Chase. Those cell phone numbers were then reassigned to Ms. James and Ms. Seniuk, both of whom obtained new phone numbers in early 2015.

Significantly, Plaintiffs' experiences with Chase are not unique. Indeed, discovery in this case shows that Chase called up to 675,000 unique cellular telephone numbers associated with its deposit accounts[3] business line from January 1, 2014 through March 22, 2016, where Chase's records contain a notation indicating that Chase called a wrong or reassigned cellular telephone number. Of note, once Chase places a notation on an account indicating that its customer's phone number is incorrect, it is Chase's policy to immediately cease future calls to that phone number.

**B.     Despite facing significant obstacles to proving liability and attaining class certification, Plaintiffs' litigation efforts resulted in a meaningful recovery for consumers who received unintended, autodialed calls from Chase.**

While Plaintiffs strongly believe in their claims, Chase vehemently disputes that it violated the TCPA. To that end, Chase raised a host of defenses to Plaintiffs' claims, including:

- At the time of this settlement, the Supreme Court had yet to issue a ruling in *Spoeko v. Robins*, No. 13-1339, on the question of whether the alleged violation of a federal statute, without anything more, confers Article III standing. A broad, adverse ruling by the Supreme Court could have eliminated Plaintiffs' claims, and those of the class, in their entirety.[4]

---

[3]     A deposit account is a savings account, checking account, or other type of bank account that allows money to be deposited and withdrawn by the account holder. These transactions are recorded on the bank's books, and the resulting balance is recorded as a liability for the bank and represents the amount owed by the bank to the customer. This case is limited to calls to cellular phone numbers associated with Chase deposit account customers, as opposed to customers of other Chase business lines, such as mortgage or auto loan customers.

[4]     The Supreme Court decided *Spoeko* on May 16, 2016 and, after *Spoeko*, this Court retains jurisdiction over Plaintiffs' claims and the approval of the settlement. *See Rogers v. Capital One Bank (USA), N.A.*, No. 1:15-CV-4016-TWT, 2016 WL 3162592, at *2 (N.D. Ga. June 3, 2016) (citing *Spoeko* and holding: "Here, the Plaintiffs alleges that the Defendant made unwanted phone calls to their cell phone numbers, in violation of the TCPA. As the Eleventh Circuit has held, a violation of the TCPA is a concrete injury. Because the Plaintiffs allege that the calls were made to their personal cell phone numbers, they have suffered particularized injuries because their cell phone lines were unavailable for legitimate use during the unwanted calls. The Plaintiffs have alleged sufficient facts to support standing. The Defendant's motion to dismiss should be denied."); *Booth v. Appstack, Inc.*, No. C13-1533JLR, 2016 WL 3030256, at *5 (W.D. Wash. May 25, 2016) ("Here, the court is satisfied that Plaintiffs' allegations demonstrate 'concrete injury' as elucidated in *Spoeko*. In

- Also at the time of the settlement, the D.C. Circuit Court of Appeals was weighing a consolidated appeal of the Federal Communications Commission's July 10, 2015 Declaratory Ruling and Order ("2015 FCC Order"). Adverse action by the D.C. Circuit could have profoundly negative consequences for Plaintiffs' claims. For example, the D.C. Circuit could adopt the position advanced by Chase that the term "called party" under the TCPA refers to the intended recipient of a call, and not the person actually called. Such an interpretation could do away with, or significantly curtail, the viability of wrong number TCPA claims, like those asserted by Ms. James, Ms. Seniuk, and absent class members here.

- The 2015 FCC Order, while favorable for consumers, included a one-call safe harbor for calls made to reassigned cellular telephone numbers, like those at issue here. Because of this safe harbor, Chase may have a viable defense to many of the calls it made to absent class members.

- Plaintiffs also faced significant risk that at least some of their claims would be dismissed under the "emergency purposes" exemption of the TCPA. In enacting the TCPA, Congress provided an express exemption for calls "made for emergency purposes." 47 U.S.C. 227(b)(1)(A). Discovery in this case indicates that some of the calls to class members (and those to Ms. James) were made for the purpose of notifying consumers of potential fraudulent activity on their bank accounts. Had this case proceeded to summary judgment, Chase would vigorously argue that these calls are exempt from any liability, even when made to a person other than a Chase customer.

- Chase also contended that it maintains robust safeguards to ensure compliance with the TCPA. While Chase vehemently disputes any liability, to the extent any violations did occur, Chase would argue that any violation of the TCPA was unintentional and would not support increased statutory damages.

- Plaintiffs faced significant risks in obtaining class certification. In particular, because Chase necessarily does not have the name and address of each person it called at the wrong number (but does have the cellular telephone numbers it dialed), Chase would argue that the class is not ascertainable. Chase also would argue that individualized issues predominate (such as whether a call was made for an emergency purpose, whether class members suffered "concrete" harm to confer Article III standing, and whether a call truly reached a wrong number), and that a litigation class should not be certified for a host of additional reasons. Indeed, several courts in this Circuit have refused to certify TCPA class actions, making the likelihood of certification uncertain. *See, e.g.*, *Shamblin*

---

*Spokeo*, the 'injury' Plaintiffs incurred was arguably merely procedural and thus non-concrete. *See id.* In contrast, the TCPA and WADAD violations alleged here, if proven, required Plaintiffs to waste time answering or otherwise addressing widespread robocalls. (*See generally* 2AC; Plf. MSJ.) The use of the autodialer, which allegedly enabled Defendants to make massive amounts of calls at low cost and in a short period of time, amplifies the severity of this injury. As Congress and Washington State's legislature agreed, such an injury is sufficiently concrete to confer standing.").

v. *Obama for America*, No. 8:13-cv-2428-T-33TBM, 2015 WL 1909765, at *8 (M.D. Fla. Apr. 27, 2015); *Balthazor v. Central Credit Servs., Inc.*, No. 07-61822, 2012 WL 6725872, at *3-4 (S.D. Fla. Dec. 27, 2012).

After months of discovery and motion practice, the parties attended Court-ordered mediation with Mr. Daisley. While the parties did not settle the case at the full-day mediation session, they made significant progress and ultimately agreed to the settlement outlined herein. The settlement resolves this litigation on a nationwide basis.

### C.   The settlement provides for a non-reversionary common fund of $3.75 million and direct mail notice to all known class members.

The Agreement defines a class under Rule 23(b)(3) comprised of:

All persons in the United States who received calls from Chase between January 1, 2014 and March 22, 2016 that (a) were directed to a phone number assigned to a cellular telephone service, (b) were wrong number calls – in that the subscriber or customary user of the phone number called was different from the party that Chase was trying to reach, (c) were placed using an automatic telephone dialing system, and (d) were directed to a phone number associated with a Chase deposit account according to Chase's records.

Participating class members will receive a pro-rata share of the $3.75 million settlement fund, after expenses are deducted. Thus, the common fund equates to more than $5.55 for each potential class member[5]—a result that compares favorably to other TCPA settlements with large financial institutions. And, while the exact per-class-member recovery will not be known until class members are provided with an opportunity to submit claims, given historical claims rates in TCPA cases (approximately 4-6%), each participating class member is likely to receive between $45 and $75,

---

[5]      This amount is calculated by dividing the total settlement fund ($3.75 million) by the number of unique cellular telephone numbers associated with a deposit account identified by Chase as containing a code indicating that the call recipient informed Chase that it called the wrong number (no more than 675,000). Dividing the number of potential class members by the gross settlement fund allows the parties and the Court to compare this settlement to similar TCPA class action settlements. *See* Argument, B.4, *infra*. To be clear, however, the expected per-claimant recovery will greatly exceed this amount, and is expected to be between $45 and $75 per claimant.

after deducting notice and administration costs, attorneys' fees and expenses, and incentive awards for Ms. James sand Ms. Seniuk. In exchange, class members will release their claims arising out of Chase's use of an automatic telephone dialing system to place calls to class members' cellular telephones during the class period.

Subject to Court approval, the costs of notice and administration, an award of attorneys' fees and expenses, and incentive awards for Ms. James and Ms. Seniuk also will be deducted from the $3.75 million fund. To that end, Chase agrees not to oppose incentive awards to Ms. James and Ms. Seniuk of $5,000 each. Plaintiffs also will seek the reimbursement of class counsel's expenses not to exceed $15,000, and an award of attorneys' fees not to exceed 30 percent of the common fund. Of note, Chase has not agreed to these attorneys' fees and expenses and may oppose the requested attorneys' fees and expenses in whole or in part. Moreover, the Court's approval of such fees and expenses is not a condition of the settlement.

The Agreement also requires an ample notice program, including direct mail notice to each member of the class who can be identified through Chase's call records. The class administrator will take all reasonable steps necessary, including the use of reverse phone number look-ups to obtain current addresses based on cell phone records, to ensure that class members receive direct mail notice where reasonably practicable. In addition, notice of the settlement will be published in People magazine or a publication of comparable readership and a dedicated website and toll-free phone number will be created where class members can receive additional information and submit claims.

## Argument

### A.   The proposed settlement class satisfies the requirements of Rule 23 and should be certified for settlement purposes.

To certify the proposed class, Plaintiffs must satisfy each of the four requirements of Rule 23(a), commonly referred to as numerosity, commonality, typicality, and adequacy of representation,

as well as Rule 23(b)(3). *See Manno v. Healthcare Revenue Recovery Grp.*, 289 F.R.D. 674, 683-84 (S.D. Fla. 2013) (certifying TCPA class action). And particularly because certification is sought in the context of a settlement, the requirements of Rule 23(a) and 23(b)(3) are readily satisfied. *See*, *e.g.*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial.").

### 1.    The class is so numerous that joinder is impracticable.

The first requirement of Rule 23(a) is that the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The numerosity requirement of Rule 23(a) is satisfied by the impracticability of joinder, which is generally presumed if a putative class amounts to more than forty individuals." *Holman v. Student Loan Xpress, Inc.*, No. 9:08-cv-305-T-23MAP, 2009 WL 4015573, at *2 (M.D. Fla. Nov. 19, 2009) (Merryday, J); *see also Jones v. Firestone Tire and Rubber Co., Inc.*, 977 F.2d 527, 534 (11th Cir. 1992) (finding that fewer than twenty-one individuals is generally inadequate). Here, because the class contains approximately 675,000 members throughout the United States, numerosity is satisfied.

### 2.    Questions of law and fact are common to the class.

"Commonality is satisfied by the existence of at least one issue affecting all or a significant number of proposed class members." *Holman*, 2009 WL 4015573, at *2. "To meet the commonality requirement, the moving party must demonstrate that the class action involves issues susceptible to class-wide proof." *Roundtree v. Bush Ross, P.A.*, 304 F.R.D. 644, 659 (M.D. Fla. 2015) (certifying class action) (citing *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009)). "Essentially, the moving party must show that the determination of the truth or falsity of a common contention will resolve an issue that is central to the validity of each of the claims in one stroke.

Commonality therefore requires at least one issue whose resolution will affect all or a significant number of the putative class members." *Roundtree*, 304 F.R.D. at 659. Notably, "Rule 23 does not require that all the questions of law and fact raised by the dispute be common." *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986).

Here, class members' claims stem from the same factual circumstances, in that Chase made calls to class members' cellular telephones, using an ATDS, which are alleged to have violated the TCPA in that Chase was calling the wrong number. *See Gehrich v. Chase Bank USA, N.A.*, Case No. 12 C 5510, 2016 WL 806549, at *4 (N.D. Ill. Mar. 2, 2016) ("The proposed class also satisfies commonality and typicality. Each class member suffered roughly the same alleged injury: receipt of at least one phone call or text message from Chase to her cell phone.").

Thus, common questions include whether Chase used an ATDS as defined by the TCPA to place the calls at issue, and whether Chase is liable for calls made to wrong numbers when it intended to reach its own customers. Accordingly, the commonality requirement is satisfied. *See Malta v. Fed. Home Loan Mortg. Corp.*, No. 10-1290, 2013 WL 444619, at *2 (S.D. Cal. Feb. 5, 2013) ("Here, the proposed class members' claims stem from the same factual circumstances, in that the calls were made by Wells Fargo to class members . . . using auto-dialing equipment or with a prerecorded voice message. There are also several common questions of law, including: (1) whether Wells Fargo negligently violated the TCPA; (2) whether Wells Fargo willfully or knowingly violated the TCPA; and (3) whether Wells Fargo had 'prior express consent' for the calls. Accordingly, the commonality requirement is met."); *Bellows v. NCO Fin. Sys., Inc.*, No. 3:07-CV-01413-W-AJB, 2008 WL 4155361, at *6 (S.D. Cal. Sept. 5, 2008) ("In my judgment, the commonality requirement is met here. The putative class claims stem from the same alleged conduct, *i.e.,* NCO allegedly calling consumers on their cellular telephones, or other wireless devices, without 'prior express

consent,' using an 'automatic telephone dialing system' or an 'artificial or prerecorded voice.' The putative class claims are legally and factually similar.").

### 3. The claims asserted by Ms. James and Ms. Seniuk are typical of the claims of class members.

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality is satisfied by showing the existence of 'a sufficient nexus ... between the claims of the named representative and those of the class at large.'" *Holman*, 2009 WL 4015573, at *3 (quoting *Hines v. Widnall*, 334 F.3d 1253, 1256 (11th Cir. 2003)).

Here, Chase called the cellular telephones of Ms. James and Ms. Seniuk, like the other members of the class, while intending to reach its own customers. Because Ms. James and Ms. Seniuk are not, and never have been, Chase customers, and because the calls Chase made to them were to wrong numbers, Ms. James and Ms. Seniuk unquestionably are members of the class, and they possess the same interests, assert identical claims, and seek identical relief on behalf of members of the class. As a result, Plaintiffs' claims are typical of those of the class. *Gehrich*, 2016 WL 806549, at *4 ("All class members allegedly received calls or text messages from Chase in violation of the TCPA, and that is enough to satisfy the typicality requirement."); *Bellows*, 2008 WL 4155361, at *6 ("Also, in my judgment, the typicality requirement is met here. Plaintiff alleges that NCO violated the TCPA by calling his cellular telephone, without 'prior express consent,' using an 'automatic telephone dialing system' or an 'artificial or prerecorded voice.' Plaintiff's claims are identical to the claims of the Class Members.").

### 4. Ms. James, Ms. Seniuk, and their counsel will continue to fairly and adequately protect the interests of the class.

Next, the Court must determine if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[C]lass counsel and the class

representatives are adequate representatives of the class if (1) plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation and (2) the plaintiffs lack interests antagonistic to those of the rest of the class." *Holman*, 2009 WL 4015573, at \*2 (quoting *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir. 1987)).

As set forth above, Plaintiffs' claims are aligned with the claims of the class, and Ms. James and Ms. Seniuk therefore have every incentive to vigorously pursue class members' claims, as they have done to date.  Ms. James and Ms. Seniuk have been actively involved in this litigation since its inception, participated in the discovery process, and each attended in-person mediation with Mr. Daisley.

In addition, Ms. James and Ms. Seniuk retained the services of Greenwald Davidson Radbil PLLC, which has ample experience representing plaintiffs in consumer class actions, including nationwide TCPA class actions. *See, e.g.*, *Prater v. Medicredit, Inc.*, No. 14-00159, 2015 WL 8331602, at \*2 (E.D. Mo. Dec. 7, 2015); *Jones v. I.Q. Data Int'l, Inc.*, Case 1:14–cv–00130–PJK–GBW, 2015 WL 5704016, at \*2 (D.N.M. Sept. 23, 2015); *Ritchie v. Van Ru Credit Corp.*, No. 12-01714, 2014 WL 3955268, at \*2 (D. Ariz. Aug. 13, 2014). Plaintiffs' counsel therefore are well-equipped to handle the instant litigation, as their work in this case demonstrates. To be sure, a district court recently noted that Plaintiffs "ha[ve] retained counsel experienced and competent in class action litigation. [Plaintiffs'] attorneys—Greenwald Davidson Radbil PLLC—have been appointed as class counsel in more than a dozen consumer protection class actions in the past two years." *McWilliams v. Advanced Recovery Sys., Inc.*, 310 F.R.D. 337, 340 (S.D. Miss. 2015) (collecting cases appointing Greenwald Davidson Radbil PLLC as class counsel); *see also* Ex. A at ¶¶ 5-14.

Ms. James, Ms. Seniuk, and their counsel therefore satisfy Rules 23(a)(4) and 23(g). *Roundtree*, 304 F.R.D at 661 (Whittemore, J.) ("As set forth in greater detail in her motion,

Greenwald has been appointed as class counsel in a number of actions and thus provides great experience in representing plaintiffs in consumer class actions.").

**5. Common questions predominate over any individual issues.**

In addition to meeting the four requirements of Rule 23(a) and the requirements of Rule 23(g), parties seeking class certification must demonstrate that the action is maintainable under one of the three subsections of Rule 23(b). Here, the class satisfies Rule 23(b)(3).

The predominance factor "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998).

Here, the central legal issue before this Court is whether Chase's automated calls to class members violated the TCPA. Additional common questions include whether Chase used an ATDS as defined by the TCPA, and whether Chase is liable for "wrong number" calls—that is, whether Chase violated the TCPA by placing autodialed calls intended for its own customers but whose phone numbers were reassigned to different persons. These common questions predominate over any individual issues. *Gehrich*, 2016 WL 806549, at *5 ("The common questions listed above are the main questions in this case, they can be resolved on a class-wide basis without any individual variation, and they predominate over any individual issues. The proposed class satisfies Rule 23(b)(3)."); *see also Malta*, 2013 WL 444619, at *4 ("The central inquiry is whether Wells Fargo violated the TCPA by making calls to the class members. Accordingly, the predominance requirement is met."). Further, predominance is buttressed because each class member "is eligible to receive an identical pro-rata share of the settlement fund, suggesting that there is no need for an individualized determination of the share each class member is entitled to." *Lo v. Oxnard European*

12

*Motors, LLC*, No. 11-1009, 2011 WL 6300050, at *3 (S.D. Cal. Dec. 15, 2011).

> **6.    Class treatment is superior to other available methods for the fair and efficient adjudication of the claims here.**

To determine if the superiority requirement of Rule 23(b)(3) is satisfied, this Court must consider: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Fed. R. Civ. P. 23(b)(3).

Because the claims in this case all arise from the same conduct on the part of Chase, a class action is the superior vehicle for determining the rights of absent class members. *Palm Beach Golf Center-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 699 (S.D. Fla. 2015) (certifying TCPA class action, and finding that, "[g]iven the large number of purported members in this suit and the similarity of their claims, disposition by class action is an efficient use of judicial resources. Moreover, the relatively small potential recovery in individual actions ($500 in the absence of a finding of willfulness) and reduced likelihood that plaintiffs will bring suit also weighs in favor of class resolution."); *St. Louis Heart Center, Inc. v. Vein Centers for Excellence, Inc.*, No. 12-174, 2013 WL 6498245, at *11 (E.D. Mo. Dec. 11, 2013) ("Because the statutory damages available to each individual class member are small—at most $1500 per violation—it is unlikely that the class members have interest in individually controlling the prosecution of separate actions. This action involves thousands of plaintiffs, each with a relatively small, nearly identical claim, who might not otherwise seek or obtain relief absent a class action. . . . Although there may be some administrative tasks for the parties, such as matching [telephone] numbers to updated contact information, that is not enough to outweigh the benefits of treating these claims all together. All in all, a class action is superior to

other methods of adjudicating this controversy.").

Indeed, resolving the claims of hundreds of thousands of persons through this one action is superior to the potential for thousands of duplicative lawsuits, and the high likelihood that additional thousands of meritorious claims will go unredressed.

**B.     This Court should preliminarily approve the settlement as "fair, reasonable, and adequate" under Rule 23(e).**

Rule 23(e) requires that the Court make a preliminary determination of fairness:

> Review of a proposed class action settlement generally involves two hearings. First, counsel submit the proposed terms of settlement and the judge makes a preliminary fairness evaluation. In some cases, this initial evaluation can be made on the basis of information already known, supplemented as necessary by briefs, motions, or informal presentations by the parties. If the case is presented for both class certification and settlement approval, the certification hearing and preliminary fairness evaluation can usually be combined. . . . The judge must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms and must direct the preparation of notice of the certification, proposed settlement, and date of the final fairness hearing.

MANUAL FOR COMPLEX LITIGATION § 21.632 (4th ed. 2004); *see also* 4 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS, § 11.25 (4th ed. 2002).

After the preliminary fairness evaluation has been made, the class has been certified for settlement purposes, and notice has been issued, the Court then holds a final fairness hearing to determine whether the proposed settlement is truly fair, reasonable, and adequate. *See* MANUAL FOR COMPLEX LITIGATION § 21.633-34; 4 NEWBERG, *supra* at § 11.25.

Preliminary approval requires only that the Court evaluate whether the settlement: (1) was negotiated at arm's-length; and (2) is within the range of possible litigation outcomes such that "probable cause" exists to disseminate notice and begin the formal fairness process. *See* MANUAL FOR COMPLEX LITIGATION §21.632-33. Indeed, "[p]ublic policy strongly favors the pretrial settlement of class action lawsuits." *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992).

While a full fairness inquiry is unnecessary at the preliminary approval stage, the Eleventh

Circuit has identified six factors to be considered in analyzing the fairness, reasonableness, and adequacy of a class action settlement under Rule 23(e): (1) the existence of fraud or collusion behind the settlement; (2) the complexity, expense, and likely duration of the litigation; (3) the stage of the proceedings and the amount of discovery completed; (4) the probability of the plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of the class counsel, class representatives, and the substance and amount of opposition to the settlement. *Leverso v. SouthTrust Bank of AL., N.A.*, 18 F.3d 1527, 1530 (11th Cir. 1994); *see also Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). Each relevant factor supports the conclusion that the settlement here is fundamentally fair, adequate, and reasonable, and should be preliminarily approved.

### 1. There was no fraud or collusion behind the settlement.

The parties' extensive arm's-length settlement negotiations through Court-ordered mediation demonstrate the fairness of the settlement, and that the settlement is not a product of fraud or collusion. To be sure, the parties reached this settlement as a result of the determined efforts of Mr. Daisely, an experienced mediator who was specifically appointed by the Court to mediate this case.[6] Indeed, the parties did not resolve this matter during the full-day mediation session, but only did so after further negotiations in the following weeks overseen by Mr. Daisley.

In addition, the parties' mediation occurred after written discovery, after the Court denied Chase's motion to stay this matter, and just two months before the close of discovery. As a result, the parties—and counsel with extensive experience in TCPA litigation—were able to properly assess the strengths and weaknesses of their positions and evaluate the fairness of the settlement.

---

[6]     Mr. Dailey has mediated well over 1,500 cases since becoming certified in 2004. He has 30 years of experience in the negotiation, mediation, arbitration and trial of a wide range of legal disputes, and mediates approximately 300 cases a year. *See* http://daisleymediation.com/robert-m-daisley/ (last visited June 10, 2016).

**2. The complexity, expense and likely duration of the litigation favors preliminary approval of the settlement.**

There exists "an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Assoc. for Disabled Am., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 466 (S.D. Fla. 2002); *Access Now, Inc. v. Claire's Stores, Inc.*, No. 00–14017–CIV., 2002 WL 1162422, at *4 (S.D. Fla. May 7, 2002) (both citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)). "Courts consistently recognize that the complexity, expense, and likely duration of litigation are critical factors in evaluating the reasonableness of a settlement . . . ." *In re Advanced Battery Tech., Inc. Sec. Litig.*, 298 F.R.D. 171, 175 (S.D.N.Y. 2014); *Amoco Oil*, 211 F.R.D. at 469 ("The parties have spent a great deal of time and expense analyzing the legal and factual issues this case presents . . . [and] therefore, have good cause to settle this matter, another factor favoring this Court's approval of the settlement agreement.").

By their very nature, because of the uncertainties of outcome, difficulties of proof, and lengthy duration, class actions readily lend themselves to compromise. *See Van Bronkhorst v. Safeco Corp.*, 529 F.2d 943, 950 (9th Cir. 1976) (public interest in settling litigation is "particularly true in class action suits . . . which frequently present serious problems of management and expense").

This case was no different. The parties engaged in discovery and significant motion practice, including Chase's motion to stay this case and Chase's motion to stay discovery. Significant motion practice lay ahead as well, including competing motions for summary judgment and Plaintiffs' motion for class certification. Given the considerable work already performed—and the work left to perform, including any appeals—settlement was warranted. *See, e.g.*, *Bennett*, 96 F.R.D. at 349-50 (plaintiffs faced a "myriad of factual and legal problems" that led to "great uncertainty as to the fact and amount of damage," which made it "unwise [for plaintiffs] to risk the substantial benefits which the settlement confers ... to the vagaries of a trial").

**3.  The factual record is sufficiently developed to enable Ms. James, Ms. Seniuk, and class counsel to make a reasoned judgment concerning the settlement.**

Courts also consider "the degree of case development that class counsel have accomplished prior to settlement" to ensure that counsel had an adequate appreciation of the merits of the case before negotiating. *In re Checking Overdraft Litig.*, 830 F. Supp. 2d 1330, 1349 (S.D. Fla. 2011). At the same time, "[t]he law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations." *Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992).

Here, the litigation had been ongoing since October 2015, and included briefing on two motions to stay. The parties also engaged in written discovery, focused both on Plaintiffs' individual claims, and on the claims of absent class members. Moreover, the parties exchanged comprehensive mediation statements in advance of settlement talks, which outlined the strengths and weaknesses in each side's case. Additionally, class counsel conducted detailed interviews with Chase personnel to confirm the accuracy of information provided during the discovery process. The settlement was, therefore, consummated when the parties had a good view towards the strengths and weaknesses of their respective positions. *See Mashburn v. Nat'l Healthcare, Inc.*, 684 F. Supp. 660, 669 (M.D. Ala. 1988) ("That is, Class Counsel developed ample information and performed extensive analyses from which to determine the probability of their success on the merits, the possible range of recovery, and the likely expense and duration of the litigation.").

**4.  The probability of Plaintiffs' success on the merits and the range of possible recovery favor preliminary approval.**

The Court must also consider "the likelihood and extent of any recovery from the defendants absent ... settlement." *In re Domestic Air Transp.*, 148 F.R.D. 297, 314 (N.D. Ga. 1993); *see also Ressler*, 822 F. Supp. at 1555 ("A Court is to consider the likelihood of the plaintiff's success on the

merits of his claims against the amount and form of relief offered in the settlement before judging the fairness of the compromise."). In determining whether a settlement is fair in light of the potential range of recovery, courts are guided by the important maxim that the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate. *In re Checking Overdraft Litig.*, 830 F. Supp. 2d at 1350. This is because a settlement must be evaluated in light of the attendant risks with litigation. *Id.* These factors also weigh in favor of the settlement here.

While Ms. James and Ms. Seniuk believe strongly in their claims, by any objective assessment they faced significant hurdles to obtaining class-wide relief. Among the obstacles to prevailing on their claims and those of the class include:

- The then-pendency of the appeal before the Supreme Court in *Spokeo*, which could have eliminated Plaintiffs' claims, and those of the class, in their entirety.

- The pendency of the consolidated appeal of the 2015 FCC Order, where an adverse decision could eliminate, or significantly curtail, the viability of wrong number TCPA claims, like those asserted by Ms. James, Ms. Seniuk, and absent class members.

- The one-call safe harbor for calls made to reassigned cellular telephone numbers set forth in the 2015 FCC Order provided Chase with a viable defense to many of the calls it made to absent class members.

- Plaintiffs also faced significant risk that at least some of their claims would be dismissed under the "emergency purposes" exemption of the TCPA. *See* 47 U.S.C. 227(b)(1)(A). Discovery in this case indicates that some of the calls to class members (and those to Ms. James) were made for the purpose of notifying consumers of potential fraudulent activity on their bank accounts.

- Plaintiffs faced significant risks in obtaining class certification, including hurdles related to the ascertainability of the class and the commonality and predominance requirements of Rule 23. *See, e.g.*, *Shamblin*, 2015 WL 1909765; *Balthazor*, 2012 WL 6725872.

- Even had Plaintiffs prevailed on the merits, Chase's robust TCPA safeguards made the prospect for the recovery of treble damages unlikely. Moreover, at least some courts view awards of aggregate, statutory damages with skepticism and reduce such awards on due process grounds. *See, e.g.*, *Aliano v. Joe Caputo & Sons—Algonquin, Inc.*, No. 09 C 910, 2011 WL 1706061, at *4 (N.D. Ill. May 5, 2011) ("[T]he Court cannot fathom how the minimum statutory damages award for willful FACTA violations in this case —

between $100 and $1,000 per violation — would not violate Defendant's due process rights . . . . Such an award, although authorized by statute, would be shocking, grossly excessive, and punitive in nature.").

Despite these obstacles, Ms. James and Ms. Seniuk negotiated a settlement that compares favorably to similar TCPA class action settlements. As noted above, dividing the settlement fund of $3.75 million by 675,000 (the maximum number of potential class members) amounts to more than $5.55 per person. In contrast, in *Picchi v. World Fin. Network Bank*, Case No. 11-CV-61797-CIV-Altonaga/O'Sullivan (S.D. Fla. Jan. 30, 2015), final approval was granted in a similar wrong number TCPA class action against a financial institution for $2.63 per person (settling claims of 3 million potential class members for $7.9 million)—less than half the amount class members will receive here.

Here, the settlement provides substantial, immediate cash relief to the class. The settlement requires Chase to create a common fund of $3.75 million. From this fund, each class member who timely submits a claim will receive an equal share after expenses are deducted. Thus, and assuming administration costs of $600,000, incentive awards of $5,000 each for Ms. James and Ms. Seniuk, and an award of attorneys' fees of 30 percent of the common fund plus the reimbursement of litigation expenses not to exceed $15,000, if 5 percent of class members submit claims—a typical claims rate for a TCPA class action—each person should receive approximately $59, an amount that compares favorably to TCPA settlements generally. For example, in *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781 (N.D. Ill. 2015), the Northern District of Illinois granted final approval of a class settlement under the TCPA where, after accounting for attorneys' fees and expenses, participants received approximately $39.66—significantly less than the estimated per-claimant recovery here.

Per-claimant recoveries in other TCPA class actions against large financial institutions are similar. *See, e.g., Rose v. Bank of Am. Corp.*, Nos. 11 C 2390 & 12 C 4009, 2014 WL 4273358, at

*10 (N.D. Cal. Aug. 29, 2014) (approving TCPA class settlement where participating class members received between $20 and $40 each); *Steinfeld v. Discover Fin. Servs.*, No. C 12-01118 JSW, 2014 WL 1309352 (N.D. Cal. Mar. 31, 2014) (less than $50 per TCPA claimant); *Arthur v. Sallie Mae, Inc.*, 10–CV198–JLR , 2012 WL 4075238 (W.D. Wash. Sept. 17, 2012) ($20-$40 per participating class member); *Adams v. Allianceone Receivables Mgmt., Inc.*, No. 3:08-cv-00248-JAH-WVG, Doc. 113 (S.D. Cal. Apr. 23, 2012) (settlement of $9 million to a class of 6,079,411—or about $1.48 per class member if every class member submitted a claim).[7]

Thus, given the significant risks in continued litigation in light of the amount recovered for class members, this settlement is fair, reasonable, and adequate and should be preliminarily approved.

### 5. The opinions of Ms. James, Ms. Seniuk, and class counsel favor preliminary approval.

As noted above, class counsel is experienced in class action litigation, having litigated consumer protection cases on a class-wide basis in many jurisdictions, including those under the TCPA. Ms. James, Ms. Seniuk, and class counsel firmly believe that the settlement is fair, reasonable, and adequate, and in the best interests of class members.

Further, a strong initial presumption of fairness should attach to the proposed settlement

---

[7]  *See also Spillman v. RPM Pizza, LLC*, No. 10-349, 2013 WL 2286076, at *4 (M.D. La. May 23, 2013) (approving settlement that provides up to $15 cash payment for TCPA violation); *In re Jiffy Lube Int'l, Inc.*, No. 11-02261 (S.D. Cal.) (class members entitled to vouchers for services valued at $17.29 or a cash payment of $12.97); *Garret, et al. v. Sharps Compliance, Inc.*, Case No. 1:10-cv-04030, ECF No. 74 (N.D. Ill.) ($28.13 recovery per claimant); *Agne v. Papa John's Int'l, et al.*, 2:10-cv-01139, ECF No. 389 (W.D. Wash.) ($50 recovery plus $13 merchandise per claimant); *Clark v. Payless ShoeSource, Inc.*, 2:09-cv-00915, ECF Nos. 61 at 3, 72 (W.D. Wash.) ($10 merchandise certificate per claimant); *Cubbage v. The Talbots, Inc. et al.*, 2:09-cv-00911, ECF No. 114 (W.D. Wash.) ($40 or $80 merchandise certificate per claimant); *Hovila v. Tween Brands, Inc.*, 2:09-cv-00491, ECF No. 12 (W.D. Wash.) ($20 or $45 merchandise certificate); *Kazemi v. Payless ShoeSource, Inc. et al.*, 3:09-cv-05142, ECF No. 94 (N.D. Cal.) ($15 merchandise certificate).

because it was reached by experienced counsel after arm's-length negotiations with a seasoned mediator. Courts accord great weight to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation. *See Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution."); *Mashburn*, 684 F. Supp. at 669 ("If plaintiffs' counsel did not believe these factors all pointed substantially in favor of this settlement as presently structured, this Court is certain that they would not have signed their names to the settlement agreement."); *In re Domestic Air Transp.*, 148 F.R.D. at 312-13 ("In determining whether to approve a proposed settlement, the Court is entitled to rely upon the judgment of the parties' experienced counsel."). For all of the foregoing reasons, the settlement agreement here should be preliminarily approved.

### C.    The proposed plan of notice satisfies the requirements of Rule 23 and due process and should be approved.

Under Rule 23(e), the Court must "direct notice in a reasonable manner to all class members who would be bound" by the proposed settlement. Fed. R. Civ. P. 23(e)(1). Notice of a proposed settlement to class members must be the "best notice practicable." *See* Fed. R. Civ. P. 23(c)(2)(B). "[B]est notice practicable" means "individual notice to all members who can be identified through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). In short, "[t]he adequacy of class notice is measured by reasonableness," and "[t] he notice must provide the class members with information reasonably necessary to make a decision whether to remain a class member and be bound by the final judgment or opt out of the action." *Roundtree v. Bush Ross, P.A.*, No. 8:14-cv-357-T-37AEP, 2015 WL 5559461, at *1 (M.D. Fla. Sept. 18, 2015) (quoting *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1239 (11th Cir. 2011)).

Here, the parties have agreed to a robust notice program to be administered by a well-regarded third-party class administrator—Kurtzman Carson Consultants LLC ("KCC")—with

significant experience in the administration of TCPA class actions. First, Chase will provide to KCC a listing of all cellular telephone numbers it dialed, associated with a deposit account, that contain a wrong or reassigned phone number designation. KCC will then use one or more third-party vendors to perform reverse look-ups of these phone numbers to obtain class members' names and addresses, which will be updated through the National Change of Address system, which updates addresses for all people who moved during the previous four years and filed a change of address with the U.S. Postal Service. Each person identified through this process will be sent, via U.S. mail, a postcard notice with a detachable claim form, in the form attached to the Agreement as Exhibits A and C.

In addition, notice of the settlement will be published in People magazine or a magazine of comparable readership, in the form attached to the Agreement as Exhibit E. KCC estimates that this publication notice will reach 17.7% of class members, thus buttressing the direct mail notice.

Separately, KCC will establish a dedicated settlement web site, www.jamestcpasettlement.com, through which class members can review relevant pleadings, review the question-and-answer notice (attached as Exhibit F to the Agreement), and submit claims.

Finally, KCC will establish a toll-free phone number, 1-844-225-4535, through which class members can request additional information, have questions about the settlement answered, and submit claims.

This notice plan complies with Rule 23 and due process because, among other things, it informs class members of: (1) the nature of the action; (2) the essential terms of the settlement, including the definition of the class and claims asserted; (3) the binding effect of a judgment if the class member does not request exclusion; (4) the process for objection and/or exclusion, including the time and method for objecting or requesting exclusion and that class members may make an appearance through counsel; (5) information regarding class counsel's request for an award of

attorneys' fees and expenses; (6) the procedure for submitting claims to receive settlement benefits; and (7) how to make inquiries and obtain additional information. Fed. R. Civ. P. 23(c)(2)(B); *Roundtree*, 2015 WL 5559461, at *1 ("The class notice provides reasonably adequate information about the nature of the action and the class settlement, and provides sufficient details for class members to determine whether to remain in the class or opt out. Accordingly, the form and content of the class notice are approved.").

In short, this notice plan ensures that class members' due process rights are amply protected and should be approved. *See* Fed. R. Civ. P. 23(c)(2)(A).

### D.    The Court should schedule a final approval hearing.

The last step in the settlement approval process is a final approval hearing at which the Court may hear all evidence and argument necessary to make its final settlement evaluation. Fed. R. Civ. P. 23(e)(2). Proponents of the settlement may offer argument in support of final approval. In addition, class members who have properly objected to the settlement may be heard at this hearing. The Court will determine after the final approval hearing whether the settlement should be approved, and whether to enter a judgment and order of dismissal under Rule 23(e).

### Conclusion

For the foregoing reasons, Ms. James and Ms. Seniuk respectfully request that this Court preliminarily approve the settlement and enter the proposed order submitted concurrently, appoint Ms. James and Ms. Seniuk as class representatives, and appoint Greenwald Davidson Radbil PLLC as class counsel. As noted, Defendant does not oppose the requested relief.

Dated: June 24, 2016

*/s/ Michael L. Greenwald*
Michael L. Greenwald
James L. Davidson
Jesse S. Johnson
GREENWALD DAVIDSON RADBIL PLLC
5550 Glades Road, Suite 500
Boca Raton, FL 33431
Telephone: 561.826.5477
Fax: 561.961.5684
mgreenwald@gdrlawfirm.com
jdavidson@gdrlawfirm.com
jjohnson@gdrlawfirm.com

Aaron D. Radbil
GREENWALD DAVIDSON RADBIL PLLC
106 E. 6th Street, Suite 913
Austin, TX 78701
Telephone:  512.322.3912
aradbil@gdrlawfirm.com

Class Counsel

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was electronically filed on June 24, 2016, via the Court

Clerk's CM/ECF system, which will provide notice to all counsel of record:

Michael S. Hooker
Guy P. McConnell
Phelps Dunbar LLP
100 S. Ashley Drive, Suite 1900
Tampa, FL 33602
Telephone: 813-472-7550
Michael.Hooker@phelps.com
Guy.McConnell@phelps.com

Mitchell E. Zamoff
HOGAN LOVELLS US LLP
80 South Eighth Street, Suite 1225
Minneapolis, MN 55402
Telephone: (612) 402-3000
mitch.zamoff@hoganlovells.com

Adam K. Levin

Carolyn A. DeLone
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
adam.levin@hoganlovells.com
carrie.delone@hoganlovells.com

Counsel for Defendant

<u>/s/ Michael L. Greenwald</u>
Michael L. Greenwald